**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STEEL, PAPER and FORESTRY, | ) | |
| RUBBER, MANUFACTURING, ENERGY, | ) | |
| ALLIED INDUSTRIAL and SERVICE | ) | |
| WORKERS INTERNATIONAL UNION, | ) | Case No. 07-CV-316 -GKF-PJC |
| and its LOCAL 13-857, a LABOR | ) | |
| ORGANIZATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CONOCOPHILLIPS COMPANY, | ) | |
| a FOREIGN CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

**O P I N I O N   A N D   O R D E R**

This matter comes before the court on defendant ConocoPhillips Company's Motion for

Summary Judgment [Doc. No. 57].   For the reasons set forth below, defendant's motion is

granted.

Defendant operates an oil refinery (the "Refinery") in Ponca City, Oklahoma.  Plaintiff

United Steel Workers' International Union and its Local 13-857 ("Union") is the collective

bargaining representative of certain employees at the Refinery.  Under the terms of the parties'

collective bargaining agreement ("CBA" or "Agreement"), the Union filed nine grievances

against ConocoPhillips between March and April 2007.  The parties undertook the initial steps of

the grievance procedure outlined in the CBA, but were unable to settle the grievances.  The

Union then requested arbitration.  The Company refused to arbitrate the grievances on the

grounds that they originate under Article 11 of the CBA, which reserves to the Company certain

managerial rights not subject to arbitration.

The Union filed this lawsuit to compel arbitration pursuant to §301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. §185(a).  The Company has moved for summary judgment, arguing the grievances are not arbitrable because they relate to matters within the Company's sole managerial discretion and thus are excluded from arbitration as a matter of law.  The Union contends the grievances implicate provisions of the CBA that *are* subject to arbitration and, therefore, summary judgment is inappropriate.

## I.  Material Facts

1.  ConocoPhillips' Ponca City Refinery processes domestic and international crude oils delivered by pipeline from throughout North America.  The Union is the collective bargaining representative for a majority of the production and maintenance employees at the Refinery. Bargaining unit employees are organized into various work groups known as "progression units."  Each progression unit is comprised of one or more "classifications," which consist of groups of employees who share the same job position. [Doc. No. 57, Defendant's Statement of Undisputed Material Facts, ¶1, Ex. A, ¶3; Ex. B., p. 9, Art. 1; Doc. 62, Plaintiff's Statement o Material Facts in Dispute].

2.  The Company and the Union entered into a CBA on March 31, 2002, and thereafter extended the term of the Agreement until March 31, 2009**.**  Article 30 of the CBA, "Settlement of Grievances," sets forth a three-step process for resolving disputes between the Company an the Union.  If the parties cannot resolve a grievance after the first two steps of the process, either party may advance the grievance to the final step, which is arbitration.  Article 30 stipulates that "[o]nly differences arising between the Union and the Company relating to interpretation or performance of this Agreement which cannot be adjusted by mutual agreement and have gone

2

through the grievance procedure are arbitrable, except as otherwise provided by this Agreement." [Doc. No. 57, Defendant's Statement of Undisputed Material Facts, ¶2, Ex B, p. 10, Art.2, pp. 25-27, Art 30; Doc. No. 62, Plaintiff's Statement of Material Facts in Dispute].

    3.  Article 11 of the CBA, titled "Management's Rights," lists rights and responsibilities reserved solely to management. Article 11 states in pertinent part:

> Hiring, maintaining order, and discipline or discharge for just cause are solely the responsibility of Management.
>
> Other responsibilities, solely those of Management are:  the assignment of work subject only to the other provisions of this Agreement; the determination and location of any part or all of the physical plant; the determination of the number of persons required to operate and maintain any portion or all of the physical plant; the determination of the machine and tool equipment, products to be manufactured, manufacturing and processing methods, production schedules and engineering;...the decision to operate, determine the level of operation, or to shut down any portion or all of the plant; the right to relocate any part or all of the plant, this includes the right to discontinue any part or all of the business; the right to transfer any piece of equipment, processing, manufacture, packaging of any product to another company, corporation, partnership, or individual.
>
> It is also solely the responsibility of Management to determine and to redetermine the organization of the Ponca City Refinery including, but not limited to, its location, relocation, types of operation; and to determine the methods, processes and materials to be employed; to discontinue in whole or in part processes or operations or to discontinue their performance by employees of the Refinery or of the Company; to transfer either within or without the Company any work, technology, equipment or process performed by employees covered by this Agreement....
>
> Grievances originating under Article 11 are subject to the grievance procedure but cannot be submitted to arbitration, and no arbiter has the authority to rule on Article 11 with the exception of just cause in the first sentence of Article 11.

[Doc. No 57, Defendant's Statement of Undisputed Material Facts, ¶3, Ex. B, CBA, Art. 11, pp. 11-12; Doc. No. 62, Plaintiff's Statement of Material Facts in Dispute].

4.  In 2006, Company management representatives developed a new operating philosophy that called for the addition of approximately eight Area Production Supervisors ("APSs") to be assigned to different areas of the Refinery.  APSs are first-level supervisors who are responsible for providing day-to-day guidance to unit operators and ensuring the various units within the Refinery are operated in a safe and environmentally sound manner in accordance with the Company's business plan.  The Company's new operating philosophy also called for elimination of the Lead Operator classification, as well as various organizational changes to the Still Cleaner progression unit. [Doc. No. 57, Defendant's Statement of Undisputed Material Facts, ¶4, Ex. A, Affidavit of Francis S. Cichoslki, Jr., ¶¶4-5; Doc. No. 62, Plaintiff's Statement of Material Facts in Dispute, ¶1].  The Company also decided to eliminate one Tester position in the Control Laboratory progression unit which had been vacated by an employee who was promoted to another position. [Doc. No. 57, Defendant's Statement of Undisputed Material Fact, ¶11, Ex.A, Cicholski Aff., ¶6; Doc. No. 62, Plaintiff's Statement of Disputed Material Facts, ¶7].

**Lead Operation Classification**

5.  The Lead Operator Classification was eliminated from the East Plant, North Plant, West Plant, South Plant, Coker/Combo and Alky progression units.  Previously, lead operators were primarily responsible for maintaining a safe workplace, performing limited administrative duties, and directing and assisting other operators as needed. [Doc. No. 57, Defendant's Statement of Undisputed Material Facts, ¶6, Ex. E, Dep. of Jason Smith, pp. 23-24, Ex. G, Lead Operator Roles and Responsibilities; Doc. No. 62, Plaintiff's Statement of Material Facts in Dispute, ¶1].

6.  After elimination of the Lead Operator classification, the Company divided up the

work between APSs and unit operators, with the majority of the work going to the unit operators, while the management and supervisory duties were given to APSs.  The Company did not terminate the approximately 25 lead operators whose positions were eliminated as a result of this change, but rather moved them into either APS or unit operator positions. [Doc. No. 57, Defendant's Statement of Undisputed Material Facts,  ¶6, Ex. A, Cicholski Affidavit, ¶4; Doc. No. 62, Plaintiff's Statement of Material Facts in Dispute, ¶1].  The Company eliminated the Lead Operator classification as part of its new operating philosophy, which included a renewed emphasis on improving overall efficiency and effectiveness.  The change was also implemented to provide "line of sight" direction to operators, meaning an excess level of direction was removed to provide better clarity of the roles and responsibilities of unit operators. [Doc. No. 57, Defendant's Statement of Undisputed Material Facts, ¶6, Ex. A, Cicholski Affidavit, ¶4; Doc. No. 62, Plaintiff's Statement of Material Facts in Dispute, ¶1].

7.  By letters dated January 12, 2007, and April 5, 2007, the Company notified the Union of its plan to implement the aforementioned changes to the Refinery organization. [Doc. No. 57, Defendant's Statement of Undisputed Material Facts, ¶5, Exs. C and D; Doc. No. 62, Plaintiff's Statement of Material Facts in Dispute, ¶2].   The changes were originally scheduled to take place on March 1, 2007, but were later postponed and did not become effective until April 23, 2007.  Prior to implementing the changes, the Company and the Union met several times to discuss seniority and rate changes caused by the Company's actions, as well as to answer any questions the Union had concerning the changes.  The Union voiced objections to the changes and claimed the CBA did not permit the Company to implement them without first bargaining with the Union.  The Company took the position that Article 11 of the CBA gave it the unilateral

5

right to implement the changes.  The Union filed an unfair labor practice charge with the

National Labor Relations Board ("NLRB"), alleging the Company had failed to bargain with the

Union over mandatory subjects of bargaining.  The Union subsequently withdrew the charge

based on "lack of evidence," according to Jason Smith, the chairperson of the local union. [Doc.

No. 57, Defendant's Statement of Undisputed Material Facts, ¶5, Ex. E, Dep. Of Jason Smith,

pp. 5, 8-9, Ex. F; Doc. No. 62, Plaintiff's Statement of Material Facts in Dispute, ¶2].

    8.  The Union filed Grievance R07-11 challenging the elimination of the lead operator

classification on March 23, 2007, a month before the change actually took place.  The letter

notifying the Company of the grievance stated in pertinent part:

> ...certain duties peculiar to the lead operator classification have been reassigned
> to other classifications, and to management.  These duties include but are not
> limited to, safe work permit responsibilities, duties described in th unit operating
> procedures, and general direction and guidance to other operators or shifts.

> We believe these duties are operators duties as described in Article 1 of the
> CBA.  We also cite Articles 3, 20-1, 20-4, 21 and appendix A in this grievance.

[Doc. No. 57, Defendant's Statement of Undisputed Material Facts, ¶7, Ex. H, p. 1; Doc. No. 62,

Plaintiff's Statement of Material Facts in Dispute, ¶4].  The Company denied Grievance R07-11

at Steps 1 and 2 of the grievance procedure, the Union demanded arbitration, and the Company

declined to arbitrate on the grounds that Article 11 of the CBA provides management with the

inherent right to make work assignments, and the right, while subject to the grievance procedure,

is not subject to arbitration. [Doc. No. 47, Defendant's Statement of Undisputed Material Facts,

¶7, Ex. H, pp. 2-4; Doc. No. 62, Plaintiff's Statement of Material Facts in Dispute, ¶4].

    9.  After the Lead Operator classification was eliminated on April 23, 2007, the Union

filed six additional grievances against the Company–one for each progression unit in which the

Lead Operator classification was eliminated.  The grievances–R07-16, R07-17, R07-18, R07-19, R07-20 and R07-21, contain identical allegations that the Company improperly reassigned work previously performed by lead operators to APSs and unit operators in violation of Articles 1, 3, 20-1, 20-4,20-5, 20-6, 20-15, 21-1, 21-9 and Appendix A (Rate Schedule) of the CBA.  The Company denied all six grievances at Step 1 and Step 2 of the grievance procedure, the Union demanded arbitration, and the Company asserted the decisions to eliminate positions and re-determine the organization are Article 11 rights not subject to arbitration. [Doc. No. 57, Defendant's Statement of Undisputed Material Facts, ¶8, Ex. I; Doc. No. 62, Plaintiff's Statement of Material Facts in Dispute, ¶4].

## Still Cleaner Progression Unit

10.  Workers in the Still Cleaner progression unit are responsible for cleaning out coke still equipment between batch operations.  In the past, cleanouts were performed by three-man crews comprised of a cleaner, sluicer, and helper–all of whom were members of the Still Cleaner progression unit.  To alleviate safety concerns over how cleanouts were being performed, the Company combined the cleaner, sluicer and helper classifications into a single classification, "Still Cleaner," and assigned two still cleaners per cleanout.  No employee was laid off or terminated as a result of this change; affected employees were transferred to other positions within the Refinery.  Additionally, the Company created a Drum Operator position within the Coker/Combo progression unit and transferred some of the cleanout preparation work to that position.  The Drum Operator position is now filled around the clock by unit operators in the Coker/Combo progression unit, who rotate through the position on a weekly basis.  In addition to their regular operator duties, the drum operators are responsible for a portion of the preparatory

work before the still cleaners commence their cleanout, including isolating energy before the coke equipment is disassembled and cleaned. [Doc. No. 57, Defendant's Statement of Undisputed Facts, ¶9, Ex. A, Cicholski Aff., ¶5 and Ex. E., Dep. of Jason Smith, pp. 29-31; Doc. No. 62, Plaintiff's Statement of Material Facts in Dispute, ¶6].

11.   On April 24,2007, the Union filed Grievance R07-14, alleging changes to the Still Cleaner progression unit violated Articles 1, 3, 21-1, 36, 36-1, 36-2, 36-3 and 36-9 of the CBA. The Company denied Grievance R07-14 at Step 1 and Step 2.  The Union requested arbitration and the Company rejected the request on the grounds that decisions to eliminate positions, and re-determine the organization are Article 11 rights and not subject to arbitration. [Doc. No. 57, Defendant's Statement of Undisputed Material Facts, ¶10, Ex. J; Doc. No. 62, Plaintiff's Statement of Material Facts in Dispute, ¶6].

### Tester Position

12.   The Company notified the Union on April 3, 2007, of its decision to eliminate a tester position in the Control Laboratory progression unit that had been vacated by an employee who was promoted to another position.  The Company determined that, due to improved efficiencies in the progression unit and a more general move toward a structured sampling collection process, one fewer tester was needed. [Doc. No. 57, Defendant's Statement of Undisputed Material Facts, ¶11, Ex. A, Cicholski Aff., ¶6; Doc. No. 62, Plaintiff's Statement of Material Facts in Dispute, ¶7].

13.   On April 24, 2007, the Union filed Grievance R07-15, in which it alleged the Company improperly reassigned work performed by the tester position, in violation of Articles 1, 3, 21-1, 21-2, 21-3 and Appendix A (Rate Schedule) of the CBA.  The Company denied

Grievance R07-15 at Step 1 and Step 2 of the grievance procedure and the Union requested arbitration. The Company rejected the request on the grounds that the decision to eliminate positions is an Article 11 right and therefore not arbitrable. [Doc. No. 57, Defendant's Statement of Undisputed Material Fact, ¶11, Ex. A, ¶6, Ex. K; Doc. No. 62, Plaintiff's Statement of Material Facts in Dispute, ¶7].

14. On June 4, 2007, the Union filed this lawsuit seeking to compel the Company, pursuant to §301 of the LMRA, to arbitrate each of the foregoing nine grievances. [Doc. No. 2].

## II.  Applicable Standard for Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When applying this standard, a court must examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. *Wolf v. Prudential Insurance Co. of America*, 50 F.3d 793, 796 (10th Cir. 1995). The movant for summary judgment must meet the initial burden of showing the absence of a genuine issue of material fact, then the nonmovant bears the burden of pointing to specific facts in the record "showing a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." *Id*.

## III.  Analysis

The CBA at issue provides for arbitration of grievances. [Doc. No. 57, Ex. B, Art. 30]. However, Article 11, Management's Rights, provides that grievances arising under Article 11, while subject to the grievance procedure, "cannot be submitted to arbitration." [*Id.,* Art. 11]. At

9

issue, then, is whether the challenged actions are subject to arbitration under Article 30 or exempt from arbitration under Article 11.

The Tenth Circuit has affirmed that "[t]here is a longstanding federal policy of promoting industrial harmony through the use of collective bargaining agreements." *Oil, Chemical & Atomic Workers International Union (AFL-CIO) v. Conoco, Inc.,* 241 F.3d 1299, 1303 (10th Cir. 2001) (citations omitted). "Federal policy also favors voluntary arbitration as a means of settling disputes about the terms of such agreements." *Id.* (citations omitted). Nevertheless:

> ...in spite of that federal policy, the question of whether the parties to a collective bargaining agreement are obligated to submit a dispute to arbitration is essentially a matter of construing the agreement.  Thus, a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.

*Id.* (citation omitted).

"[T]he question of whether the parties have submitted a particular dispute to arbitration, i.e., the question of arbitrability, is an issue for judicial determination unless the parties clearly and unmistakably provide otherwise." *Local 5-857 Paper, Allied-Industrial Chemical and Energy Workers International Union  v. Conoco Inc.,* 320 F.3d 1123, 1126 (10th Cir. 2003). However, in deciding whether a grievance is arbitrable, "a court is not to rule on the potential merits of the underlying claims." *Id.*  The Tenth Circuit has stated:

> [W]hen a contract contains an arbitration clause, there is a presumption in favor of arbitrability; that is, an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.  The Supreme Court has held that the presumption is "particularly applicable" where...there is a broad arbitration clause. In such cases, in the absence of any express provision excluding a particular grievance from arbitration, we think only the most forceful evidence of purpose to exclude the claim from arbitration can prevail.

*Id.*, citing *AT&T Techs., Inc. v. Communications Workers of Am.,* 475 U.S. 643, 650 (1986) (other citations and quotations omitted).

ConocoPhillips and the Union have an extensive history of litigation over the issue of whether or not grievances arising under this CBA and its predecessors fall within the CBA's "managerial decisions" provision and are thus not arbitrable. Two lawsuits, *Local 5-857 Pace, supra,* and the *OCAW v. Conoco* case, 241 F.3d 1299 and *OCAW Local 5-391 v. Conoco, Inc.,* 64 Fed. Appx. 178 (10th Cir. 2003) (unpublished opinion)*,* were ultimately decided by the Tenth Circuit. This case, as well as a similarly styled lawsuit, Case No. 06-CV-363-GKF-TLW, are currently pending before the court. In both, the Union has challenged the Company's claim that decisions regarding elimination of and/or changes in job assignments fall exclusively within the ambit of Article 11 of the CBA and are therefore not arbitrable. Here, the Union claims all three challenged actions violate or implicate other articles  and are therefore subject to arbitration.

As an initial matter, the court notes that most of the responsibilities Article 11confers upon management–including hiring, the determination of the number of persons required to operate and maintain any portion of the physical plant and the right to determine or redetermine the organization of the Refinery–are absolute. While decisions in these areas are subject to the grievance procedure, they cannot be submitted to arbitration. The one exception to this absolute right is in the area of job assignment. Article 11 gives the Company responsibility for "the assignment of work *subject only to the provisions of this Agreement.*"

The Tenth Circuit's decisions in the earlier disputes between Conoco and the Union instruct that where the Company decision involved reassignment of work, the court must scrutinize the CBA to determine whether the decision implicated any other articles of the CBA.

11

If other articles are implicated by the decision then the court–without deciding whether the articles were, in fact, violated–must deem the Company action to be arbitrable.

Two of the three Company decisions challenged herein–elimination of the Lead Operator classification and reorganization of Still Cleaner duties–clearly involved reassignment of work. The third decision–elimination of a Tester position–did not.

## A.  Lead Operator Grievances

Grievances R07-11, R07-16, R07-17, R07-18, R07-19, R07-20 and R07-21 all relate to the Company's decision to eliminate the Lead Operator position from the East Plant, North Plant, West Plant, South Plant Coker/Combo and Alky progression unit.  The work previously performed by the Lead Operators at those locations was divided between APSs and unit operators.  The Lead Operators whose positions were eliminated were moved into either APS or operator positions.

The Union contends the elimination of the position violated Articles 1, 3, 20-1, 20-4, 20-5, 20-6, 20-15, 21-1, 21-9 and Appendix A (Rate Schedule) of the CBA.   Furthermore, citing *Gugleilmino v. McKee Foods Corporation,* 506 F.3d 696 (9th Cir. 2007) and *Karnes v. Boeing Company,* 335 F.3d 1189 (10th Cir. 2003), the Union asserts it is "'master' of its own claims," and thus entitled to characterize the alleged violations of articles of the CBA as it sees fit.[1]  The Union is certainly entitled to assert violations of these articles.  However, in the previous litigation between these two parties,   the Tenth Circuit  has made it clear that the court, guided

_____

[1]These cases relate to jurisdictional challenges and stand for the proposition that under the "well-pleaded complaint" rule, the plaintiff is considered the "master of the claim" and can plead to avoid federal jurisdiction.  *Gugleilmino,* 506 F.3d at 700; *Karnes,* 335 F.3d at 1192-93. They do not support the Union's claim that its allegations of which articles have been violated compel a conclusion that the articles have been violated or even implicated.

12

by the legal principles outlined above, must conduct an analysis of the language of the CBA to determine whether the conduct complained of originates under the management rights article or whether the Company's decision implicated other articles of the contract. *OCAW v, Conoco, Inc.,* 64 Fed.Appx. at 182; *PACE v. Conoco,* 320 F.3d at 1126-27. In other words, the Union's claim that certain articles were violated is not dispositive. Rather, it is the court's responsibility to determine whether the articles invoked by the Union are, in fact, implicated by the Company's action.

### 1. Article 1

Article 1 of the CBA, titled "Recognition," states in pertinent part:

> The Company hereby recognizes the Union as the sole and exclusive representative for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment and other conditions of employment as certified by the National Labor Relations Board in Case No. 16-RC-6182.

[Doc. No. 57, Ex. B, CBA, Art. 1]. The Union contends the Company violated Article 1 by eliminating positions without bargaining. [Doc. No. 57, Ex. E., Smith Depo., p. 28]. However, the court finds nothing in Article 1 that limits the Company's right to eliminate the Lead Operator position. *See OCAW v. Conoco,* 64 Fed.Appx. at 185 (holding that nothing in an identical Article 1 "Recognition" provision placed any limitation on Conoco's right to create and define the Yield Analyst position). Article 1 is not implicated by the elimination of the Lead Operator provision.

### 2. Article 3

Article 3 of the CBA, titled "Exclusive Agreement," provides:

This contract is the entire Agreement between the United Steel, Paper and Forestry,

Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union on behalf of the bargaining unit employees represented by Local 13-857 and Ponca City Refinery Unit, ConocoPhillips Inc.  No practices, payments of wages or benefits prior to this Agreement date shall act to change or enlarge the express wording of this Agreement.  All Agreements subsequently entered into by the parties during the term of this Agreement shall also be considered a part of this Agreement when reduced to writing and signed by authorized representatives of the Company and the Union.

[Doc. No. 57, Ex. B, Art. 3].  The Union claims the elimination of the Lead Operator classification "changed" the CBA and therefore violated Article 3. [Doc. No. 57, Ex. E, Smith Depo., pp. 9-11].  However, Article 3 does not limit the Company's right under Article 11 to eliminate positions and reassign work.  Therefore, Article 3 has no bearing on the Company's decision.

### 3.  Article 20-1

Article 20 of the CBA is titled "Seniority."  Article 20-1 of the CBA, "Bidding," states:

Providing an employee has the necessary qualifications, seniority rating as defined in Article 20-2 shall be the determining factor for bidding and bumping.

Ranking number in a progression unit will be the determining factor for promoting or demoting within a progression unit or demoting out of progression unit.

[Id., Art. 20-1].  The Union argues the elimination of the Lead Operator classification violates Article 20-1 because unit operators no longer have the option of bumping into the higher Lead Operator position. [Id., Ex. E., Smith Depo., pp12-14].  However, Article 20-1 contains no language barring the Company from eliminating a job classification.  Therefore, Article 20-1 is not implicated by the Company's action.

### 4.  Article 20-4

Article 20-4, "Filling Permanent Vacancies Within a Progression Unit," addresses at length the procedure for filling permanent vacancies, and specifically addresses the Lead

Operator position:

> Filling a permanent vacancy in the Lead Operator classification shall be by the
> selection/qualification process.  All other permanent vacancies within a progression
> unit will be filled by the employees in the progression unit moving up, leaving
> the bottom number in the progression unit vacant....

[*Id.,* Art. 20-4].  The elimination of the Lead Operator classification did not result in any

permanent vacancies.  Nevertheless, the Union asserts the Company's elimination of the Lead

Operator position violates this provision because the language shows that classification was

negotiated between the parties and therefore, the Company could not unilaterally eliminate a

classification. [*Id.,* Ex. E, Smith Depo., pp. 15-16].  However, Article 20-4 deals only with the

protocol for filling vacancies.  It contains no language prohibiting the Company from eliminating

positions.  Therefore, Article 20-4 is not implicated by the Company's action.

### 5.  Article 20-5

Article 20-5, "Frozen Employees," states:

> No employee will be frozen unless the Company doctor determines he is physically
> unable to advance to the next higher classification.  The period of time his is
> frozen will be limited to the time he is physically unable to advance.  No more
> than one employee can be frozen in any classification.  Employees promoting
> around a frozen employee shall also demote around him for the first calendar
> year.  After one calendar year, if the employee remains frozen then he is subject
> to once around, always around, for any employee who promotes around him
> according to paragraph 20-12.

[*Id.,* Art. 20-5].  The Union claims the Company's elimination of the Lead Operator position

violates this provision.  The Union concedes no employees were frozen by the Company's

elimination of the Lead Operator classification, but asserts Article 20-5 is implicated because the

CBA requires the Company to maintain multiple classifications within a progression unit

because the elimination of a second classification would mean "there's nowhere for someone to

be frozen." [*Id.,* Ex. E, Smith Depo., pp. 17-18].   However, neither Article 20-5 nor any other article cited by the Union contains such a limitation.   Moreover, Article 20-5 contains no language limiting the Company's Article 11 right to eliminate positions.   Therefore, Article 20-5 is not implicated by the Company's action.

### 6.  Article 20-6

Article 20-6, "Disqualification Procedure," states, "It is recognized that employees must meet all qualifications of their job as a condition of employment." [Doc. No. 57, Ex. B., Art. 20-6].  It goes on to detail the procedure for disqualification and challenges to disqualifications. [*Id.*].  The Union asserts the provision is "another article showing that we have classifications." [Doc. No. 57, Ex. E, Smith Depo., pp. 18-19].  However, it concedes no employee was disqualified by the Company's elimination of the Lead Operator classification. [*Id.*]   Moreover, Article 20-6 places no limitations on the Company's right to eliminate positions.  Therefore, the elimination of the Lead Operator classification does not implicate Article 20-6.

### 7.  Article 20-15

Article 20-15, "Bumping," describes at length the "bumping" privileges that apply when, as a result of a reduction in progression unit numbers, employees lose their numbers and are demoted out of the classification above the replacement classification in their progression unit. [Doc. No. 57, Ex. B, Art. 20-15].   The Union asserts Article 20-15 "shows that we have classifications...for a reason." [*Id.,* Ex. E, Smith Depo., p. 43].  However, Article 20-15 contains no language limiting the Company's right to eliminate classifications or reassign work. Therefore, the Company's elimination of the Lead Operator classification does not implicate Article 20-15.

16

### 8.  Article 21-1

Article 21 is titled "Job Classifications."  Article 21-1 states:

> Work peculiar to a classification shall be performed by employees assigned to that within the bargaining unit with the exception that the Company reserves the right to assign work without compromising safety to qualified employees regularly assigned to other classifications within the bargaining unit for efficient, productive and profitable operation of the plant.
>
> The Company and the Union agree the primary job skills which the various crafts are now utilizing will continue.  Job skills common to various crafts will be used by any and all craftsmen to the limit of their skills and ability to achieve a high level of productivity and efficiency.

[Doc. No. 57, Ex. B, Art. 21-1].  The Union contends the elimination of the Lead Operator classification violated Article 21-1 because work peculiar to that classification is no longer being performed by lead operators. [*Id.,* Ex. E., Smith Depo., pp. 21-22].  However, nothing in Art. 21 prohibits or limits the Company's right to eliminate classifications.  To the contrary, Art. 21-3 states, "The Company will give the Union 14 days' notice when job classifications are to be eliminated..."   This provision implicitly recognizes the Company's right to eliminate job classifications. [*Id.,* Ex. B, Art. 21-3].  Article 21-1 is not implicated by the elimination of the Lead Operator classification.

### 9.  Article 21-9

Article 21-9 provides:

> If work of a higher-paid classification is temporarily required for 4 or more hours of any employee within the bargaining unit during a regular 8-hour day, evening, or night shift, he shall receive the wages of the higher-paid classification for all hours worked in that shift.  Overtime shall be paid for at rate of job worked.

[Doc. No. 57, Ex. B, Art. 21-9].   As with Article 20-5, the Union asserts Article 21-9 guarantees a progression unit will be comprised of multiple classifications. [*Id.,* Ex. E, Smith Depo., pp. 25-

26].  Article 21-9, however, contains no such requirement.  Rather, it addresses wages for employees performing work "temporarily required" in higher-paid classifications.   There is no prohibition against elimination of job classifications.  Therefore, the elimination of the lead operator classification does not implicate Article 21-9.

### 10.  Appendix A (Rate Schedule)

Appendix A is a rate schedule for Union jobs in the Refinery.  Appendix A contains the statement:

> This Appendix is the agreed-upon base rates of pay for the listed jobs as they existed at the time of the Agreement.  It is not an agreement on the part of the Company that the listed jobs will not be changed, combined, or eliminated.

[Doc. No. 57, Ex. B, Appendix A].  The Union contends Appendix A is evidence that the parties "negotiated a lead operator position, duties to be done, and pay to be paid, and therefore the Company cannot eliminate positions."   [*Id.*, Ex. E, Smith Depo., pp. 27-28**].**  However, the language of the Appendix clearly belies the Union's assertion.  Appendix A places no limitations on the Company's right to eliminate classifications; to the contrary, it acknowledges the Company's right to do so.  Appendix A is not implicated by the Company's elimination of the Lead Operator classification.  *See OCAW Local 5-391,* 64 Fed.Appx. at 185 (rejecting Union's argument that an article incorporating appendices with rate schedules barred creation of a new Yield Analyst position).

The court thus concludes none of the CBA articles cited by the Union limits the Company's right to eliminate job classifications.  The elimination of the Lead Operator classification falls squarely within Article 11.  Company decisions originating under Article 11 are not subject to arbitration.  Therefore, the Company is entitled to summary judgment on the

Union's claim that the elimination of the Lead Operator classification must be arbitrated.

## B.  Still Cleaner Progression Unit

Effective April 23, 2007, the Company combined three existing job classifications (Cleaner, Sluicer, Helper) into a single classification and reduced the number of cleaners assigned per cleanout from three to two.  The Company also created a Drum Operator position in the Coker/Combo progression unit and transferred some of the cleanout preparation work previously performed by still cleaners to that position.  The Union filed Grievance R07-14 challenging the changes.  In its grievance, the Union claimed the Company's action violated Articles 1, 3, 21-1, 36, 36-1, 36-2, 36-3 and 36-9 of the CBA.  Since filing the lawsuit, the Union has claimed the grievance also violated Articles 20-4, 20-5, 20-6, 20-15 and 21-9.

### 1.  Articles 1, 3, 20-4, 20-5, 20-6, 20-15 and 21-9

The Union makes the same arguments for applicability of Articles 1, 3, 20-4, 20-5, 20-6, 20-15 and 21-9 to the still cleaner changes as it did to elimination of the Lead Operator classification.  For the reasons discussed in the preceding section, the court concludes these articles of the CBA are not implicated by the Company's changes in the Still Cleaner progression unit.

### 2.  Article 21-1

Article 21-1 (set out in Section IIIA8 above), provides that work peculiar to a classification is to be performed by employees assigned to the bargaining.  [Doc. No. 57, Ex. B, Art. 21-1].  The Union argues the Company's reassignment of some of the work performed by

the Still Cleaner progression unit to the newly-created Drum Operator position in the

Coker/Combo progression unit violated Article 21-1. [*Id.,* Ex. E, Smith Depo., pp. 21-22].

Article 21-1, though, expressly states that "the Company reserves the right to reassign work

without compromising safety to qualified employees regularly assigned to other classification

within the bargaining unit for efficient, productive and profitable operation of the plant." [*Id.*].[2]

The Unit has not alleged, and there is no evidence, that the reassignment compromised safety; in

fact, one of the stated reasons for the change was to alleviate safety concerns. [Doc. No. 57, Ex.

A, Cicholski Affidavit, ¶5]. Article 21-1 is not implicated by the Still Cleaner progression unit

changes.

### 3.  Article 36

Article 36, "Still Cleaning Operations," states:

Cleaning of the coke still equipment shall be paid for on a piecework basis as
outlined below except that earnings of the cleaning crew members shall not be less
than that shown in Appendix A for each hour they are engaged in work in connection
with actually cleaning each coke chamber.

Under normal conditions, hours shall not exceed 40 a week or shall an individual
engage in more than six cleanouts per week.

This contract is in force regardless of the hourly schedule.

[Doc. No. 57, Ex. B, Art. 36].   The Union claims the Company's change of the Still Cleaning

organization violates Article 36 because the drum operator is paid on an hourly rather than

piecework basis, works more than 40 hours per week and/or participates in more than six

cleanouts per week.  [*Id.*, Ex. E, Smith Depo., pp. 33-36].  However, the Company, in

---

[2]Moreover, Article 21-4 provides, "The Company may change job duties, combine jobs,
classifications, or progression units, or establish new jobs or classifications in existing
progression units." [Doc. No. 57, Ex. B, Art. 21-4].

reorganizing the Still Cleaning work, reassigned a portion of the cleaning responsibilities to the Drum Operator in the Coker/Combo progression unit, removing it from the Still Cleaning progression unit.  Thus, neither the piecework payment method nor limitations on number of hours and number of cleanouts per week do not apply to the Drum Operator position.  Article 36 is not implicated by the Still Cleaning Operations change.

### 4. Article 36-1

Article 36-1, "Handling of Delay Time," states:

> Whenever it appears that a delay will exceed 2 hours, the crew may be notified that they are not needed; and they may leave the premises until called again. During a delay of 2 hours or less, occurring before a steam test has been passed, still cleaners can be used at the option of Management on any work available. If a delay is over 2 hours and as a result still cleaners are required to work over a total of 8 consecutive hours, hours over 8 shall be paid for at 1 ½ times the base hourly rates.  Rules on call out time do not apply to contract still cleaning; however, when a still has passed the steam test and cleaners have been released, any subsequent call out to stop leaks or perform work shall be considered a call out.

[Doc. No. 57, Ex. B, Art. 36-1].   The Union contends the change in the Still Cleaners operation violated Article 36-1 because it requires the drum operator to work 12-hour shifts, and the drum operator is not permitted to go home during delay time.  The Union also claims the drum operator is not receiving time-and-a-half for hours in excess of eight hours a day. [*Id.*, Ex. E., Smith Depo., pp. 35-40].  However, Article 36-1 applies only to the Still Cleaners progression unit.  The reassignment of some of the work to the Drum Operator position in the Coker/Combo progression unit removed that work from Article 36.  The Company's change did not implicate Article 36.

### 5. Article 36-2

Article 36-2, "Cleaning Single Chamber, Necessary Piping and Fittings," describes the

procedure for cleaning piping and equipment in the Still Cleaning progression unit, and sets out

pay rates for the Coke Still Cleaner, Coke Still Sluicer and Coke Still Cleaner Helper. [Doc. No.

57, Ex. B., Art. 36-2.  The Union argues this provision prohibits the Company from combining

the three classifications into a single classification. [*Id.,* Ex. E., Smith Depo., pp. 41-42].

However, nothing in Article 36-2 limits the Company's right to combine classifications, and as

previously noted, Article 21-4 expressly confers on the Company the right to "change job duties,

combine jobs, classifications, or progression units, or establish new jobs or classifications in

existing progression units." [*Id.,* Ex. B, Art. 21-4].  Article 36-2 is not implicated by the

Company's change in the coke still cleaner process.

### 6.  Article 36-3

Article 36-3, "Overtime," provides:

(a) Payment for Time Over 8 Hours in Any Given Cleanout

> Payment of 1 ½ times the base hourly rates shall be added to the earnings
> of a cleanout for each hour worked over 8 in any given cleanout plus shift
> differential when applicable.

(b) Payment for Time Over 40 Hours in a Workweek

> Payment of 1 ½ times the base hourly rates shall be added to the week's
> earnings for each hour worked over 40 n a workweek.  Any payments
> made for time over 8 hours in a day shall be offset against pay for weekly
> overtime in that week.

[Doc. No. 57, Ex. B, Art. 36-3].  The Union contends the Company's reassignment of work

violates Article 36-3 because Drum Operators in the Coker/Combo progression unit will not be

paid time-and-a-half for hours worked over eight per day. [Doc. No. 57, Ex. E, Smith Depo., p.

43).  However, the Drum Operator position is occupied by unit operators rather than still

cleaners; therefore the Company is not required to pay overtime for hours worked over eight

unless the worker exceeds 40 hours in a given work week.  Article 36-3 is not implicated by the change.

### 7.  Article 36-9

Article 36-9, "Duties Included in Still Cleaning," states:

In addition to the actual preparation o f the equipment for cleaning, performing the cleaning, and heading up of the equipment in condition to resume operation, the work of still cleaning shall include cleaning the still area and keeping tools and equipment clean and in good condition.  It is the responsibility of the still cleaners to report tools or equipment which require repair.

It is the responsibility of th still cleaners to clean up all spilled coke.  This includes coke on platforms, north or south railway spurs, the roadway north of the Blue shop, the area south of exchanger row.  If these areas are not cleaned to the supervisors satisfaction, he may call out the cleaning crew to finish the job; and call-out pay will not be applied.

[Doc. No. 57, Ex. B, Art. 36-9].  The Union argues that the Company violated Article 36-9 by reassigning work to an operator. [Doc. No.57, Ex. E, Smith Depo., p. 44].  However, Article 36-9 does not prohibit reassignment of work and, as previously discussed, Articles 21-1 and 21-4 explicitly permit the Company to reassign work to other classifications. [Doc. No. 57, Ex. B., Arts. 21-1, 21-4].   The Company's reassignment of work does not implicate Article 36-9.

The court concludes the reorganization of still cleaner work and reassignment of part of the work to the Coker/Combo progression unit is a right originating under Article 11 and the Company's conduct did not implicate any other articles of the CBA.

### C.  Tester Position Elimination

Effective April 23, 2007, the Company eliminated a position in the Tester classification of the Control Laboratory progression unit after the position was vacated by an employee who was promoted to another job in the Refinery.  The Company determined that improved

efficiencies and a move toward structured sampling process rendered it unnecessary to fill the vacated position and eliminated the position altogether. [Doc. No. 57, Ex. A., Cicholski Aff., ¶6]. The Union responded by filing Grievance R07-15, in which it alleged the elimination of the Tester position violated Articles 1, 3, 21-1, 21-2, 21-3 and Appendix A (Rate Schedule) of the CBA.

Unlike the elimination of the Lead Operator classification and reorganization of the still cleaner work process, the elimination of the Tester position did not involve reassignment of work.  Article 11 confers on management the unqualified right to "determine the number of persons required to operate and maintain any portion or all of the physical plant," to "determine and to redetermine the organization of the Ponca City Refinery," to "determine the methods, processes and material to be employed, and to "discontinue in whole or in part processes or operations." [*Id.*] The court finds the elimination of the Tester position was governed solely by Article 11 and therefore, the Company's decision is not arbitrable.

Moreover, the court is unpersuaded that other articles the Union claims limit the Company's right to eliminate the position apply:

### 1.  Articles 1 and 3

The Union claims elimination of the Tester position violated Articles 1 and 3.  As previously discussed, Article 1 simply recognizes the Union as the sole and exclusive representative for purposes of collective bargaining regarding rates of pay, wages, hours and other conditions of employment.  Article 3 states the contract is the entire agreement between the Union and the Company.  Neither is in any manner implicated by the elimination of the Tester

position.

### 2. Article 21-1

The Union also contends Article 21-1 limits the Company's ability to eliminate the Tester position.  However, Article 21-1 simply provides that work peculiar to a classification shall be performed by employees assigned to that classification. [Doc. No. 57, Ex. B., Art. 21-1]. It contains no reference to situations where a position has been eliminated and no work is transferred or reassigned.  Thus, Article 21 imposes no limit on the Company's ability to eliminate the Tester position.

### 3. Article 21-2

Article 21-2 provides:

> If new primary job skills arise in the crafts, the Company agrees to assign the work to the appropriate craft.  If a question arises over the assignment, the Company and the Union will meet to resolve the question.

[Doc. No. 57, Ex. B, Art. 21-2].  The Union has conceded that no new primary job skills arose in the crafts as a result of the elimination of a tester position. [*Id.*, Ex. E., Smith Depo., p. 50]. Thus, Article 21-2 has no application to the Company's decision.

### 4. Article 21-3

As previously noted, Article 21-3 provides that the Company will give the Union 14 days' notice when job classifications are to be eliminated or when changes are to be made in the permanent numbers in a classification. [Doc. No. 57, Ex. B, Art. 21-3].  The Company sent notice to the Union on April 3, 2007, that effective April 17, 2007, it would eliminate a tester position. [*Id.,*, Ex. K].  A meeting was held on the issue on April 13, 2007. [*Id.*, Ex. E, Smith

Depo., p. 51].  However, the Union contends the Company violated Art. 21-3 because the

Company took the position the work was being eliminated and refused to agree with the Union's

position that the work was being reassigned to another person. [*Id.*].  Even assuming the

Company had a duty to provide notice of the elimination of the Tester position, Article 21-3

contains no language requiring the Company to agree with the Union about the elimination.

Therefore, Article 21-3 is not implicated by the Company's decision.

### 5.  Appendix A (Rate Schedule)

Appendix A sets out rate schedules for various positions, including the base rate of pay

for Control Laboratory testers. [Doc. No. 57, Ex. B, Appx. A).   The Union contends the

elimination of the Tester position violated Appendix A because the bottom job was not filled,

and therefore "the opportunity for someone to go to a higher rate was taken away."  [*Id.*, Ex. E.,

Smith Depo., pp. 51-52]. However, Appendix A merely sets forth job classifications and

payment rates.  It explicitly states, "it is not an agreement on the part of the Company that the

listed jobs will not be changed, combined, or eliminated." [*Id.,* Ex. B, Appx. A].  Appendix A

has no bearing on the decision to eliminate the Tester position.

The court finds he Company had an unfettered right under Article 11 to eliminate the

Tester position.  However, even if the right was somehow subject to the remaining provisions of

the CBA, the court finds no articles which are implicated by exercise of that right.  Therefore,

the Company is entitled to summary judgment that the decision to eliminate the Tester position

is not arbitrable.

### IV.  Conclusion

For the reasons set forth above, defendant's Motion for Summary Judgment [Doc. No.

57] is hereby granted.

ENTERED this 29th day of September, 2009.


Gregory K. Frizzell
United States District Judge
Northern District of Oklahoma